At all, Transmission Agency of Northern California, at all, Petitioners v. Federal Energy Regulatory Commission. Ms. DePoster for the Petitioners, Ms. Chu for the Respondent, Ms. Ku for the Intervener. You are ready when you are. May it please the Court. My name is Michael Postar on behalf of Petitioners. With the Court's permission, I would reserve three minutes for rebuttal. This case turns on a straightforward reading of an unambiguous contract for which the proper standard of review is de novo. Based on the unambiguous language of the contract, the legal question before the Court is whether FERC erred by inserting words into a contract that do not exist, finding that an exception exceeds the underlying obligation. If we think the contract is ambiguous, not unambiguous, then do you lose? If the contract is unambiguous, then this Court's precedent would be No, no. What if it's ambiguous? I'm sorry, Your Honor. If this Court finds that the contract is ambiguous, then this Court's precedent is to return the contract to the Commission for interpretation. The contract should also be considered based upon the reading of the contract of an exception should be narrowly construed. In addition, the interpretation should not create a conflict within the contract which this interpretation does. It's not a conflict necessarily as much as an exception, I suppose. I mean, the language is pretty definitive, PG&E shall not be required to replace any remedial action or element thereof provided under its comprehensive agreement upon cancellation or termination of that agreement. And our reading, Your Honor, is that the context matters. This Court has found that where a word is subject to multiple interpretations, look to the context. And in this situation, the context is a provision that sets out duties for remedial action. And the exception says you don't have to provide that remedial action. And the interpretation of the Commission was that not only do you not have to provide remedial action, you don't have to provide anything else as well. But isn't the known context also the provision of this remedial action in view of physical facilities upgrade and after the passage of time, the physical facilities were in fact upgraded plus the regulatory approach had changed? I mean, the context is quite supportive, I think, of the Commission's or arguably quite supportive of the Commission's reading that this was remedial action put in place for a finite period of time. It was remedial action put in place for the remedial action scheme that PG&E has in place remains. Right. But one piece of it, the remedial action, was for a contract period. Right. A very long contract period. Right. At the end of that contract, which was in place when the entire underlying contract began, the contract we're examining began, it was coming to an end. And everybody knew it was coming to an end. But the purpose of the contract is to maintain the capability of these three lines, which are the crucial link between the Pacific Northwest, the wind and hydro up there, down to the consumers in California. And there's no indication anywhere in the contract that the parties intended that that capacity should dissipate, that it should be lessened, that there should be a diminution of that capability, even with this provision, if that's exactly what the Commission's interpretation does. Well, not really. I mean, we have a shift here from, I'm not sure I'm going to get the nomenclature right, but from firm service contracts to a more pay-as-you-go situation. And that seems like that's also part of the relevant context. And that's an important part of the context. Because what the Commission finds, for example, the Commission found de minimis effects in one place within the order. And that only speaks to the portion of the market that you are addressing. That is the California... Government CAISO. The CAISO. Petitioners, the line that is primarily owned by the Transmission Agency, its members, Sacramento Municipal Utility District, Toroleco Irrigation District, et cetera, they're not part of that market. They don't operate on that paradigm. They operate on a firm basis, long-term firm contracts. They put capacity, transmission capacity out for sale, for long-term sale. So it's completely different. They require having a fixed amount of capacity. The hourly bid isn't applicable to them. When you have an exception in this situation, this Court's recognition is, is that an exception should be construed narrowly. In this case, that's particularly important. Why narrowly, though? I mean, why not just construed according to its terms, which are not narrow? Well, it's particularly important because it creates a... which is remedial action. It reads the provision to mean more than remedial action, and then it creates a conflict within the contract. And the conflict is... These are very sophisticated parties who know what they're doing, and the industry was aware of what was going on here, and the language is sweeping. Well, the language is specific to remedial action, and the contract otherwise has very specific obligations that require the parties to maintain this capability. And if there's any adverse effect on this capability from a modification or if there's an undue burden from other actions, the contract provides that there is a remedy to the parties. By interpreting it the way the Commission interpreted it, we have a conflict, and that have to apply the principle that the specific overrides the general, and the specific being the exception and the general being the two provisions, 8.7.2.2 and 12.1, that provide remedies. And the Commission said, well, those override. But there is an interpretation that is reasonable that avoids that conflict. And this Court has found that where there's a reasonable interpretation that avoids a meeting to all of the terms, that's the preferred meeting. Isn't the – isn't a possible interpretation to say, well, yes, there's a general requirement to avoid imposing undue burdens and a general requirement to avoid adverse impacts, but there's also this sweeping provision that PG&E shall not be required to replace any That will not itself be considered an undue burden or an adverse impact because that would negate the whole purpose of the provision. Because, Your Honor, there's an interpretation that does not negate the exception, we think that is not a possible reading. The interpretation that does not negate the exception is to find that PG&E would have been in violation of Section 8.6.3 without this exception. The parties came to realize that along the way, and they said, well, we don't intend for PG&E to violate 8.6.3. Put this exception in. The exception is don't have to replace the remedial action, not in violation of 8.6.3. That gives the full meeting. And it also – You're basically saying they do need to replace it. They just don't need to replace it with the remedial action that they had received from State Water. They could replace it in some other way at their – at their election. They don't need a specific exception for that. Well, Your Honor, to maintain compliance with Section 8.6.3, they needed this exception. Because had they done something else in the alternative, they still would be in violation of 8.6.3. 8.6.3 is very specific. You have to maintain the existing remedial action. And they weren't going to be able to do that. And so they needed an exception. Well, they could have. I mean, State Water says, if you want it today, you can do it. Just pay for it. But if State Water says no, or if PG&E says, I'm not going to sign up for it for – for whatever reason, then they would have been – Right. It's a very different exception the way you read it. I understand that. Now, let me just ask you to accept – and, you know, this is just by hypothesis – to understand the relationship between your different arguments. If we were to disagree with you on the reading of the exception and hold that it does absolve PG&E of any obligation to replace the remedial action or otherwise mitigate the impact of the loss of that remedial action, what is your argument that the new contract for service with State Water is a modification that imposes burdens for which PG&E needs to take responsibility? The clock turns, the contract – the comprehensive agreement has terminated, the remedial action is gone. And the next day, there's a proposal to replace existing interconnection service. And that replacement then has to be judged against the contract, the operation agreement. The operation agreement hasn't gone away. It still exists. Section 8.7.2 that says no undue burden still exists. Section 12.1 that says no adverse impacts, that still exists. It's the interconnection then has to be judged. The flows – the power flows from these generators then has to be assessed, just as it would if there was any other generator that came along to interconnect with PG&E. And at that point, the record shows in extensive testimony submitted by petitioners that those have adverse effects on the system and on petitioners and damaged petitioners. And they were – State Water was already connected. They were already connected. That's correct, Your Honor. So what is the modification? They were connected before, they're connected after. Well, the definition of modification in Section 4.27 includes connections and includes removals and includes replacements. And so the modification is a replacement. It is a new transmission facility. It is a new effect on the system. And to that, FERC says no modifications are only physical changes, right? And FERC adds language to the definition, says they have to be physical and they have to be direct physical. And that language, that's not found within the contract. And so that's one of the problems we have. We also submitted extensive testimony. Actually, PG&E is the one that submitted the testimony that said, we're going to have to reprogram these controllers. That's part of this system. We're going to have to make a change. And you make a point, well, maybe that counts as physical. Is there a requirement if there is no physical modification, if there's just a new contract with a client that's already connected? Do the imposition of burden of duties apply there? Your Honor, the definition of modification includes within it the word modification. And that is a very broad term, and it implies no physical effects. So I would say the answer is any change to the system could constitute such an effect. But if there were no physical modification, but just a new contract, they'd re-up with, for example, a client that wasn't providing remedial action. If a new contract is drawn up to continue power to such a client, is that reviewed by FERC for imposition of burdens or not? It is reviewed by the California grid operator, the California ISO, under its procedures. And they would determine what the impacts are, and if necessary, file a new contract with the commission. And it would be reviewed if they felt it needed to be filed. Can I just see if I, I want to be sure I'm following your argument here. On that last point, I understood that you had two independent arguments. One was the section regarding modifications, and one was the section regarding undue burden. Yes, sir. Right? So even if it didn't involve a modification, if it involved an undue burden, there would be a problem. Yes, sir. Right? So if, even in the circumstance that Judge Pillard was suggesting, or asking about, where you suddenly made a contract with somebody who overburdened the system and prevented, whose demands were so overburdening that it would hurt the system as a whole, that would come under the undue burden section, even if it wasn't a modification? Yes, Your Honor. Okay. And there's extensive testimony in the record on that. Okay. Now, on the question about the remedial action, my understanding is not that, of your argument, is not that 8263 is just about replacing the same remedial action for state water. Your argument is that this section says they don't have to put any new remedial action in, but doesn't say anything about other things, like expanding, increasing the amount of power availability, transfer capability, generation, transmission, those kind of additions. Correct? That's correct. Okay. Now, let me ask just one last question. You said, and I want to know whether it was just a slip of the tongue, you said that FERC had decided that, had found that there was only a de minimis effect in the CAISO area. My understanding of your argument was, maybe it's my understanding of the FERC opinion, was that they were just stating what CAISO said, not that they had made a finding of their own. Am I wrong about that? In one place, they characterize what the CAISO said. In the second place, in paragraph 42 of the rehearing order, they specifically say, I'm sorry, in paragraph 19, they specifically say a de minimis effect. They do, but the only support they have for that is to go back to the December 29th order in which the effect is listed under arguments, not under findings. That's correct. So there are two problems with it. One is, is that they did not make a finding, and the second is, even had they made the correct finding, that finding would not have been as to petitioners who are not part of the California ISO, and that testimony isn't relevant to them. So they never made a ruling on the impact analysis, the undue burden, and the adverse impacts. I see I'm out of time.  Thank you. Thank you, Your Honor. Ms. Chu. Good morning. May it please the Court, Susanna Chu for the Federal Energy Regulatory Commission. Your Honors, the Commission here gave a common-sense interpretation to a provision that is sweeping in its exclusion, excusing PG&E from taking any particular action upon the expiration of the state water contract, and on the basis of the record before the Commission and the Commission saw no reason at the time to require PG&E to do anything particular to replace the lost remedial action. Well, the Commission read the entire contract as a whole, and it recognizes that there are obligations on PG&E as one of the parties that operates this three-line transmission system, and so PG&E continues to have these obligations. And as Your Honors noted, these aren't very sophisticated parties. They continue to be in talks about any potential impacts to the system. Let me ask you first about our standard of review. Yes. So your brief repeatedly says that FERC reasonably concluded its reading of that, that its reading of the agreement was reasonable, right? Yes. FERC says its reading of the, that the agreement is unambiguous. Not just that they are reasonably reading it, but that it is unambiguous. Now, if we were to decide that it was not unambiguous, even if we thought it might be reasonable, we would have to send it back, isn't that right? I think that the Court may decide to do that, but I think that the Commission found That was not a clear answer on that. I apologize. Do you agree or not agree that if it's ambiguous, it has to go back? I don't agree that it has to go back, because the Commission did find section 8.6.3 to be unambiguous, but I think that the Court and the Commission were both looking at the entirety of the agreement, and I think the Court could uphold What does ambiguous even mean here? Because they're finding it's the better reading of the contract, by definition, if they find it unambiguous. And if it's ambiguous, they're still finding it the better reading of the contract. It's not like a statute where you have policymaking room if there's ambiguity. Right, Your Honor. And I think that's where cases like National Fuel Gas Supply and LOMAC are instructive, because those cases involved agency contract interpretations, and in LOMAC, the Court actually found that the agreement at issue there plainly contemplated, quote-unquote, that a particular event might transpire. Let me read you from one of our opinions. This is the Braintree v. Ferk, and it is quoting Amaran v. Ferk, quote, If the Commission's decision turns on an erroneous assertion that the plain language of the relevant wording is unambiguous, we must remand the matter to the Commission to require the agency to consider the question afresh in light of the ambiguity that we see. This is with respect to an agreement. Doesn't that mean that if we thought that this was ambiguous, that we have to send it back? Because we don't apply Chevron-like analysis where the agency thought everything was absolutely clear, plain language. Right. Well, I think the Court could decide that deference should be given to the agency's reading here, even if the contract is considered unambiguous, because the Commission has been delegated express authority to regulate these types of contracts, and it has technical expertise. Well, were they not given the same authority in the Braintree and the Amaran cases? It is true we don't have to do that, but only by violating our own precedents. Is that right? I understand, Your Honor. I agree. I just think it is... There's still a precedent that the Court could rely upon, I believe. What other precedent? The National Fuel Gas Supply and Lomac Petroleum. It would be pointless, presumably, because they'll just say that was the best reading of the contract, and this is still the best reading of the contract. Done. But, yeah, it's not like a statutory ambiguity case. Right, that is right, Your Honor. So pointless remands, though, are not unheard of. Can I ask about... You said that the parties were skilled and experienced. Yes. So if that's the case, why didn't they just say, at the end of 8.63, add a sentence that says, and 8.7.22 doesn't apply? Because instead what we have here is one paragraph that says you don't have to replace remedial action and another paragraph that says, again, without equivocation, extremely sweeping language, each party shall avoid imposing undue burdens on the interconnected electric system of other parties. Well, Your Honor, I don't know why the parties drafted this particular contract in the way they did, but I will say that the exclusion in 8.6.3 is extremely specific, and when you look at 8.7.2.2, the avoid imposing undue burdens language is, you know, not necessarily clear. Well, the elimination of the remedial action or the relief from the remedial action obligation under the expiring contract, if we think that is taken care of or excused by 8.6.3, then isn't the question whether the new interconnection agreement, if that's what it's called, the new contract between PG&E and State Water, is that something that imposes an undue burden? Is it your position that as a legal matter you don't look for undue burden or that you did but you found no undue burden? In that proceeding about the interconnection agreement... The termination proceeding? Correct, the termination proceeding. The standard there is whether it's just and reasonable to approve the interconnection agreement, and the Commission found it was just and reasonable to approve it. Isn't part of, I guess, as a legal matter, isn't part of the just and reasonableness inquiry there whether it imposes an undue burden? No, no, Your Honor. I think that the question of whether it imposes an undue burden would be a proceeding arising under the operation agreement itself, the agreement that's between transmission agency PG&E and the other owners of the intertie. With respect to PG&E's separate contractual relationship with its customers, State Water, there's no reason to impose a standard from a different contract into that proceeding. So in the termination proceeding, the petitioners here were asserting both that the relief from the remedial action was in violation of the operation agreement and that the new contract under KAISO was imposing an undue burden. And FERC found, no, it wasn't imposing an undue burden. What is the basis for that latter determination that there was no undue burden given that now you had, presumably, the same load as previously but without an accompanying remedial action? Just so as a practical matter as opposed to a legal matter, was there any examination of that? Well, I think the Commission found that... This is where the Commission's consideration of the California ISO's studies was relevant. And, you know, the Commission credited the California ISO studies that there would be no reliability impacts as a result of losing the remedial action. Where did they credit that? That's the part I'm having difficulty finding. I think at the termination rehearing order, paragraph 19, J.A. 2335. So in paragraph 19 is a description of the earlier decision. And it says, the Commission further considered the merits of KAISO's studies which demonstrated that termination dot dot dot would have de minimis economic impacts. That's what you're talking about, right? Oh, right. And on the next page at 2336... Yeah, that's where I am. On page 23... Is that what you're talking about where it says, the Commission relied on these factors when it determined that the termination was just and reasonable? Yes, right. The Commission further considered the merits of KAISO's studies which demonstrated that the termination of the remedial action schemes would not reduce the path rating of the intertie but would have de minimis economic impacts. Right. I'm sorry. But the footnote, footnote 33 to that is a reference to the December 29th order. And it's a reference to paragraph 55 which is in the section in which the Commission is merely describing the answers and is before the section where the Commission's determination begins which is part D. So I don't understand how if you merely describe both sides' arguments because, of course, the other side argued that it wasn't de minimis, how that becomes a finding unless you actually say and we agree with KAISO. But they never say that in the order. They only say that in the rehearing order by citing something that doesn't say that. That seems like a problem to me. Well, I think the Commission said it had relied on these factors when it determined that termination of the comprehensive agreement was just and reasonable. Do you think they did that for the first time in the order denying rehearing? Is that the idea that that's the first time that they actually considered those factors and made that determination? No, I mean, it may have been it's more generally stated but going back to the complaint rehearing order If you say it by the date it will help because they all title the same thing. Sorry. February 24, 2015 order. Yes, go ahead. Which paragraph? The Commission beginning at J.A. 1451 paragraph 55 through 61 the Commission actually goes through a number of submissions and arguments by different parties and it concludes at paragraph 61 I'm sorry Joint Appendix 1453 Yes Paragraph 61 The Commission concludes that Tank has not met its burden of establishing that PG&E has breached the operation agreement and prior to that The very next sentence says this being so we not need turn to the issue of financial consequences and on 1451 which is the beginning of that section paragraph 55 it says given our decision to deny the complaint the Commission did not need to specifically address the impact of the expiration of the comprehensive agreement on transfer capability in the region as a whole so that sounds like at least it sounds like to me that this was a construction of the contract issue and therefore they didn't and in their construction of the contract they didn't have to consider these burdens not that they considered the burdens and decided they were undue what's wrong with what I'm saying Well I hear what you're saying your honor I think that it's important to remember the Commission recognized that transfer capability at least available transfer capability which is what we're discussing in this case fluctuates on a day to day basis I mean it fluctuates in connection with various system operations so the Commission actually asked the parties to discuss the potential impacts on transfer capability and as I understand that the parties are still in discussions with the agencies dispute resolution division to discuss possible impacts and perhaps this really goes back to the standing issue and the fact that transmission agency just failed to beat its burden well not on the merits on the standing issue transmission agency has not shown that there will necessarily be an actual reduction in transfer capability an actual harm as a result of these orders I'm a little puzzled why it isn't and I'm not an expert in this field let me just say I'm a little puzzled why part of FERC's argument isn't that under the new type of contracts there is a fee that is going to fluctuate depending on for example congestion yes and so isn't the part of the response that if a new if a new contract in or allowing state water to continue in place is going to burden the intertie state water is going to have to pay more for that or I guess the question is distributed so will other clients have to pay more and they think that it should be on PG&E and state water but it's just puzzling where the evidence is the same where in fact the whole basis of contracting has changed I know the briefing really takes account of that I'm trying to make sense of that I understand your honor the context was certainly important to the commission's consideration I mean we're moving away from this world of firm transmission capacity into a world of competitive markets where people are requesting transmission capacity in real time and yes you're right in identifying congestion charges as this is a charge that the California ISO imposes when there's a lot of demand simultaneously so I don't believe as far as I know there was no showing by a transmission agency that there would have to be additional payments that congestion charges would rise I think that's where the California ISO's evidence that economic impacts would be de minimis I think that's where it ties in you know now the transmission agency responds to your reliance or you know punitive reliance on the CAISO finding of de minimis burden by saying that's CAISO we're outside of CAISO we have other evidence that shows much more significant burden and I don't see FERC having made findings that account for that right so to clarify the CAISO is it is a grid operator but it is also the designated pass operator for the California-Oregon intertie and in that capacity under the contract it actually has it has a duty to perform its obligations independently of the parties and without preference or undue discrimination that is at JA119 if you want to take a look at it so the California ISO actually performed studies in 2013 in its capacity as pass operator on behalf of and in coordination with all of the parties to the intertie and that study showed that any  would have more potential to begin with and that they would be extremely limited we're talking about potential congestion and like one half of a percentage of cases something along those lines did it have and deal with the kind of evidence that transmission agency is reported in this record I think so I think that transmission agency and California ISO were looking at the same things the transmission agency evidence on this issue was primarily I believe the testimony of Larson and that testimony is all about potential reductions and transfer capability and the transmission agency complaint itself says that they were they were using information and assumptions used by the California ISO as path operator that's the complaint paragraph 45 JA46 is it your position in terms of part of your ripeness argument is it your position that if greater burdens than CAISO currently anticipates do materialize that the the petitioners here could come back and bring a new breach case and would not in any way be precluded by a determination in this case yes absolutely the petitioners could bring a new case to the commission to the extent that there's a ripe harm to the extent that something actually happens where say their allocation of transfer capability in a system actually drops off significantly they could certainly bring a complaint to the commission and the commission could look at that and determine whether whether there actually has been a breach of one of these provisions 8.7.2 or otherwise I thought your I thought the commission's position was it doesn't matter that the remedial action section sweeps all this in isn't that right well at the time there was no reason because of the remedial action exclusion in 8.6.3 there was no reason to require PG&E to do anything didn't the commission conclude that that section overrides the undue burden section it did it did so this is a case in which one of the parties the complainant in a FERC proceeding lost and your position is that they have no standing to appeal FERC's interpretation of the contract until they can show they're harmed by FERC's interpretation of the contract yes it is our position that the petitioner is under the obligation of showing that it has article 3 standing to appeal so normally we say that if you're actually the subject of the adjudication unless it's an adjudication for which you didn't have to have standing in the first place you have standing in an ordinary contract case if a party loses do we say they can't appeal unless or they can't even bring their case to court unless they can show that they're injured by the construction of the contract I think that I think there's still there has to be an injury under traditional standing cases and they're the party though I mean the standing argument seems very weak to me well in this one thing to remember I should say the lack of standing argument seems weak understood in the context of this case transfer capability is just such a moving target and other there's not necessarily a one-to-one correspondence of loss of transfer capability and when you go back to the evidence that was offered by Mr. Larson he had said that there would be a loss in transfer capability under certain conditions high water levels and also if PG&E didn't put certain transmission upgrades in place I mean these are highly complicated systems that where there are so I'm clear on what you think the commission did did the commission decide that the undue burden provision was not relevant in light of the proviso in the replacement provision or did it decide that there was no undue burden at all here I think the commission decided that the transmission agency failed to show that there was an undue burden and can you tell me where I see the paragraph that you're talking about it doesn't mention undue burden you're talking about paragraph 19 of the re-hearing order right I think it's I understand it's a very general statement but it is I believe the complaint re-hearing order when it says that tank has not met its burden of establishing the PG&E has reached the operation agreement I think that encompasses 8.7.2.2 I think it's fair to read it that way okay we'll hear from Ms. Gu the next speaker  come forward Ms. Gu . Ms. Gu . Ms. Gu . Ms. Gu . Ms. Gu . Ms. Gu . Ms. Gu . Ms. Gu . Ms.  . Ms. Gu    . Ms. Gu . Ms. Gu . Ms. Gu . Dr. Dr. Gu . Dr. Gu . Dr. Gu . Ms. Gu . Ms. Gu . Ms. Gu . Ms. Gu . Dr.  . Ms. Gu . Dr. Gu . Ms. Gu . Dr. Gu . Ms. Gu . Ms. Gu . Dr. Gu . Ms. Gu . Ms. Gu . Dr. Gu . Dr. Why? Is there am I wrong about that? What's the answer to that point? I think it's still a. Obviously it is pre chevron but it still does indicate that the commission's kind of technical expertise interpreting a term that they find to be unambiguous and still be evaluated by the court. So and then we also had heard about the issue of section 8.6.3 versus section 8.7.2.2 kind of the duties proviso versus undue burden and on that point the duties proviso should not just be looked at with regard to the limited language that the petitioner's site of to operate maintain and replace remedial action facilities but in terms of the entire section which also talks about the fact that the remedial action is used to maintain the available system transfer capability at the levels that were in effect as of the effective date and then the duties proviso says that PG&E is not obligated to replace the remedial action once the comprehensive agreement terminates. I think in the context of that language it's clear that the parties understood that this benefit provided by the third party DWR that would increase the levels of the available system transfer capability was coming to an end and therefore PG&E should not be responsible for replacing it. In contrast section the undue burden section, section 8.7.2.2 is a very general statement of undue burden and the court has found that when it's a specific term the parties are clearly thinking about that issue and have meant to address it if it's a general term there's no clear intention on whether they had the RAS at all in mind. In addition then as far as the modification term section 12.1 the use of the word physical is not in the contract it's not in the operation agreement that was the commission's shorthand way of referring to the fact that they looked at the definition of modification they looked at what the definition said and they did not find the reprogramming of the RAS controllers to not use the DWR pumps to fall within that definition. Because everything else in the definition is physical. It's more than just physical it has very specific it's connecting of generating facilities and loads and substation equipment kind of improvements it's kind of they looked at that definition and didn't find that the reprogramming of the RAS controllers fit within that category or those categories of activities. Thank you. So on the you also had a question on the termination sorry did you have a question Nick? No but we're over time but I'll let you finish it's okay you don't have to jump back we'll let you make your point. Just on the question of the termination docket there was no change no change in the electrical characteristics no change in the interconnections DWR had been connected to the PG&E system for decades and they would continue to be connected exactly the same way the only change was in fact the fact that DWR wasn't participating in the removal action scheme any longer. Thank you. And was there no change in the nature of the contract because of the was it unbundling or so I was a little mystified by that on the one hand the assertion that there was no change and on the other hand that there's actually a whole underlying change in contracting approach. Can you enlighten me a little bit about that? Well you are correct the comprehensive agreement provided for PG&E to interconnect with DWR and provide transmission service the new agreements only provided for the interconnection of PG&E and the Department of Water Resources because the transmission service would be provided by the CAISO under the CAISO tariff so when I say no change I mean no change in the electrical interconnections but PG&E was no longer providing a firm transmission service. And maybe this is really a question for the other side but how is it that on the same grid some customers are operating under the tariff system and others are operating under firm specifications? That's actually the exact problem why the comprehensive agreement had to terminate agreements like the comprehensive agreement were leftovers from arrangements from before the ISO commenced operations and under commission policy they do not want those agreements to continue unnecessarily because it creates this discrepancy between the ISO market versus these one-on-one arrangements but to be fair to these existing transmission contract holders like the Department of Water Resources didn't require that they terminate prematurely but let them sort of die out on their own as they terminated under their own terms they're just not allowed to. Right but I think my question is a little bit different which is I think transmission agencies they still operate in their bailiwick under firm service contracts and I'm just trying to understand how those two things interact given that the grid is one physical grid under which service and the burdens that service imposes on the physical structures cannot be differentiated. That is actually a very challenging problem of managing kind of the California independent system operator and other ISO RTOs like them versus the entities that choose not to be not to fall under the grid operated by the CAISO like transmission agency in fact there have been other cases coming before the circuit dealing with the arrangements and how do you balance these issues it is a very complicated balancing act between the CAISO and the other entities. Thank you. Thank you. I know the petitioner has no time but since we've given everybody else more time we'll give you two minutes. Thank you. Can you tell me where you raise the argument that the contract is ambiguous? In our throughout our brief we oh that we've raised it it's ambiguous. It's ambiguous. I read your entire I apologize if I you never argue that it's ambiguous nor do you argue in the alternative that if it's ambiguous there should be a remand. We don't we don't state that. We don't usually consider arguments that are not made and so I'm not sure where the ambiguity you've been talking at least in the opening there was some discussion about ambiguity equals remand. You've never made that argument. Your Honor we did not believe the contract is ambiguous. I believe that applying this court's standards for reviewing a contract the contract is unambiguous. The reason you didn't make that argument is because it doesn't do much for you. If the court were to disagree with us that is ambiguous then clearly the court's precedent is return the contract. You never said that in your brief. In fact you specifically argued the contract. We don't argue that. Your argument is it's unambiguous in the opposite direction. That is correct. And you want us to apply de novo review. That is correct. You do not want us to apply deferential review. That is correct Your Honor. Returning to just briefly to one or two points. One is the Commission's decisions with respect to the controllers that we were talking about and whether those are modifications. Judge Garland's decision in Carpenters makes clear that the Commission has to provide its reasoning motor vehicles. There has to be a rational connection between the facts and the choices and the Commission didn't do that in this case. It didn't explain how it decided that what the basis was for finding that the physical changes were not modifications. Your Honor, I think that a key factor here is the Commission decided this case on a contract basis. It made no findings of fact with respect to any of Petitioner's evidence. And in fact, we filed a complaint for anticipatory breach eight months before this contract was terminating. The case was decided before the contract terminated. Since termination occurred, Petitioner's have carefully tracked impacts and there have been just as forecasted in their testimony, significant impacts on Petitioner's because the capability of the system was reduced by the grid operator, the California ISO, because of the loss of remedial action. So exactly what we said in the direct case has occurred. And that's why this case is live before this Court. It is not a situation where we can wait for the next case. We are burdened now and seek relief at this point. If we were to credit Burke's reliance on the CAISO study, it's not, I know you say we're not under CAISO, but isn't the point that you're concerned that because it's all interconnected that if CAISO has less capacity, that will burden the intertie that you control? But if CAISO says, no, we're keeping our house in order, we're not overflowing, then why isn't that a sufficient response to your evidence? I understand you have different facts, but the Commission didn't embrace them. The owners of the lines share the capacity equally among the three lines, each gets one third. Right. And as the capacity is reduced because of the loss of remedial action, Petitioner's take up one third of the reduction. And so we are burdened by the loss of remedial action. The California customers served by the California ISO have incurred substantial costs because of the loss of remedial action. That's their problem, and they don't seem to argue that, so we're leaving that alone. But our problem is we operate in a different balancing authority, and so we are affected. We can't reserve share with the Pacific Northwest. We can't import as much power as we want, hydro and wind from the Pacific Northwest. And if you lose on the reading of the replacement of remedial action provision, you don't have another way of raising those burdens, right? It all rises or falls based on- Well, we do through the interconnection, the new interconnection agreements, Your Honor. The new interconnection agreements impose undue burdens on- But relative to what? Isn't your argument still going back to the situation with the remedial action as your baseline? You say the burden is undue because compared to what the situation was with the remedial action that State Water was providing, now there's a burden. But if you say, well, no, it was legitimate to eliminate that remedial action, then it's not a burden. Compared to what? Well, the question of undue burden is one that- a question of fact that the Commission will make, and they haven't made that. But our argument is that the capacity of the lines are rated at 4,800 megawatts, and no one disputes that. And that's the measure. To the extent that we are below 4,800 megawatts, we need to assess why are we below it. And the engineering analysis shows it's because PG&E's lines can't carry the capacity that's needed. And so that's the undue burden that we would argue. I see I'm out of time, Your Honor. Thank you very much. Thank you. We'll take the matter under submission. We'll give the other next case lawyers a chance to move up, and we'll take a brief break.
judges: Garland, Kavanaugh, Pillard